1

2

3

4

5

6

7                    **IN THE UNITED STATES DISTRICT COURT**

8                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10   RODNEY WILLIAMS,                          Case Number:
                                               1:03 CV 5479 OWW DLB (NEW DJ) P
11
                              Plaintiff,       FINDINGS AND RECOMMENDATIONS
12                                             RECOMMENDING DEFENDANTS'
            vs.                                MOTION FOR SUMMARY JUDGMENT
13                                             BE GRANTED
     B. VERDUZCO, et al.,
14
                                               [Doc. 61]
15   _____/

16   I.     Procedural History

17          Plaintiff Rodney Williams ("plaintiff") is a state prisoner proceeding pro se and in forma

18   pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on plaintiff's

19   complaint filed April 18, 2003 against defendants Verduzco, Bicknell, Castillo, Heredia and Comstock

20   for use of excessive physical force in violation of the Eighth Amendment during a cell extraction at

21   North Kern State Prison.  Plaintiff also alleges violations of state law under California Civil Code

22   Section 52.

23          On September 30, 2005, defendants filed the present motion for summary judgment.  Plaintiff

24   did not file an opposition to the motion.[1]

25   II.    Legal Standard

26          Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as

27   _____

28          [1] Plaintiff was notified of the requirements for opposing a summary judgment motion on July 21, 2003.

                                              1

1   to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

2   P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any," which it believes demonstrate the absence of
> a genuine issue of material fact.

6   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden

7   of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

8   solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed,

9   summary judgment should be entered, after adequate time for discovery and upon motion, against a party

10  who fails to make a showing sufficient to establish the existence of an element essential to that party's

11  case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of

12  proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

13  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever

14  is before the district court demonstrates that the standard for entry of summary judgment, as set forth

15  in Rule 56(c), is satisfied."  Id. at 323.

16      If the moving party meets its initial responsibility, the burden then shifts to the opposing party

17  to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co.

18  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual

19  dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender

20  evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of

21  its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

22  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

23  suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec.

24  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

25  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party,

26  Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

27      In the endeavor to establish the existence of a factual dispute, the opposing party need not

28  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

2

1   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

2   T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings

3   and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S.

4   at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

5          In resolving the summary judgment motion, the court examines the pleadings, depositions,

6   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).  The

7   evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

8   inferences that may be drawn from the facts placed before the court must be drawn in favor of the

9   opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

10  (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

11  obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen

12  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

13         Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that

14  there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not

15  lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

16  Matsushita, 475 U.S. at 587 (citation omitted).

17  III.    Undisputed Facts[2]

18  1.     Plaintiff, an inmate sentenced to the California Department of Corrections and Rehabilitation,

19         was housed in the Administrative Segregation Unit (Ad-seg), cell number 116 at North Kern

20         State Prison (NKSP) on May 13, 2001.  Deposition of Rodney Williams (Williams Depo) taken

21         on May 17, 2005, at p9:12-25, 11:9-11, 13:13-25-14:4.

22  2.     In NKSP Ad-seg, inmates are housed in cells approximately 6 feet by 10.5 feet.  The cells have

23         bunk beds that are approximately 30 inches by 80 inches, a standard sized toilet approximately

24  _____

25         [2] Plaintiff neither admitted or denied the facts set forth by defendants as undisputed nor filed a separate statement
    of disputed facts.  Local Rule 56-260(b).  Therefore, the court compiled the statement of undisputed facts from defendants'
26  statement of undisputed facts and plaintiff's verified complaint.  Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir.
    1998) (verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment rule if they
27  are based on facts within the pleader's personal knowledge).  Because plaintiff neither submitted his own statement of
    disputed facts nor addressed defendants' statement of undisputed facts, the court accepts defendants' version of the facts
28  where plaintiff's verified complaint are not contradictory.

1   14 inches by 30 inches and a sink which is approximately 16 inches by 12.5 inches.  The cell

2   doors have a food port approximately 13.75 inches (horizontal) by 6 inches (vertical).  This food

3   port is used to hand out meals and supplies without the need to open the door.  The floor and

4   beds are concrete.  Declaration of G. Jaime (Jaime Decl.), ¶¶ 3-5; Declaration of B. Verduzco

5   (Verduzco Decl.), ¶ 3; Williams Depo at p. 26:12-18, 27:9-18, 27:21-28:19.

3.   On May 13, 2001, the food ports on the cells doors were open and Defendant Verduzco was
     passing out supplies in the unit.  Williams Depo at p. 17:9-11, 38:5-17; Verduzco Decl. ¶ 4.

4.   Williams put his hand in the tray slot so that the port could not be closed.  Williams also tied
     sheets through the food port and bottom of the door.  By tying the sheets in this way, Williams
     was able to keep the food port open.  Williams Depo at p.17:11-13, 17:23-24, 30:14-31;
     Verduzco Decl. ¶ 5; Declaration of R. Rote (Rote Decl.), ¶ 3; Declaration of C. Lugo (Lugo
     Decl.), ¶ 5.

5.   Williams knew that by preventing the food port from closing, he was creating a disturbance and
     could be subject to a cell extraction.  Williams Depo at p. 17:19-22, 30:14-31:24, 37:22-38:4,
     42:24-43:, 46:1-5, 109:14-25.

6.   At approximately 9:10 a.m., Defendant Verduzco informed his superior, Sergeant Rote that
     Williams attempted to throw an unknown liquid substance, brown in color and appeared to be
     a mixture of urine and feces.  Throwing feces and/or urine at staff or other inmates is referred
     to as "gassing."  Lieutenant Lugo was also notified of the situation.  Verduzco Decl. ¶¶ 4-5; Rote
     Decl ¶¶ 2-3; Lugo Decl. ¶ 3.

7.   Lt. Lugo determined that Williams would have to exit his cell and be placed on Management
     Cell Status to prevent further gassing attempts.  Cell Management Status is a strategy to deal
     with an inmate who persists in unduly, disruptive or destructive behavior by restricting the
     amount of property he possesses to prevent him from injuring himself or others.  Lugo Decl. ¶
     4.

8.   Sergeant Rote, Psychiatric Technician T. Keith and Lt. Lugo approached Williams' cell in an
     attempt to communicate with him.  A cell extraction shield was used to cover the food port, so
     that Williams' could not throw any liquid substance on staff.  Williams was ordered to "cuff up,"

4

or place his hands behind his back, place his hands through the food port and allow staff to secure handcuffs on him.  Williams refused to comply with this order.  Declaration of T. Keith (Keith Decl.), ¶¶ 3-4; Rote Decl, ¶ 4; Lugo Decl. ¶¶6-7; Williams Depo p. 17:19-24, 40:14-41:13.

9.    Williams stated that he wanted his legal property.  Williams was assured that his complaint would be looked into as soon as possible but he had to first exit his cell.  Williams refused to comply with this order.  Keith Decl. ¶ 4; Lugo Decl. ¶ 8; Williams Depo at p. 18:1-3, 28:14-16, 41:12-24, 42:14-18.

10.   Williams had milk cartons inside his cell.  The milk cartoons were located on the top bunk and easily accessible to Williams.  Lugo Decl. ¶ 9; Williams Depo p. 18:1-3, 28:14-16, 41:12-24, 42:14-18.

11.   To prevent further attempts by Williams to gas or throw liquid substances at staff, and given that he refused orders to cuff up and exit his cell, Lt. Lugo requested and received authorization from the Administrator of the Day to perform a cell extraction.   Lugo. Decl. ¶¶ 10-11.

12.   A cell extraction team was assembled.  This team consisted of Correctional Officers B. Verduzco (Shield Officer), A. Bicknell (Baton Officer), D. Castillo (Handcuff Officer), S. Heredia (Leg Iron Officer), B. Comstock (Extra Officer) and C. Martinez (Video Camera Operator).  Sergeant R. Arote was the team leader for the extraction and Medical Technician Assistant B. Chavez was present from the Medical Department.  Verduzco Decl. ¶ 6; Declaration of B. Comstock (Comstock Decl.), ¶ 3; Declaration of D. Castillo (Castillo Decl), ¶2; Declaration of S. Heredia (Heredia Decl), ¶¶ 2-3; Declaration of A. Bicknell (Bicknell Decl.), ¶¶ 2-3; Declaration of B. Chavez (Chavez Decl.), ¶ 2; Declaration of C. Martinez (Martinez Decl.) ¶ 2; Lugo Decl. ¶ 12.

13.   All staff were briefed on the situation.  Lugo Decl. ¶ 13.

14.   Sergeant Rote utilized an emergency cut-down tool to cut the sheet holding Williams' food port open.  Williams was again ordered to submit to handcuffs.  He continued to refuse to comply.  Rote Decl. ¶ 5; Williams Depo at p. 46:13-18.

15.   At 10:45 a.m., Sergeant Rote, Psychiatric Technician T. Keith and Lt. Lugo approached Williams' cell and continued to attempt to verbally persuade Williams to "cuff up" and

1    voluntarily exit his cell.  Williams refused to comply with the order to cuff up or to exit his cell.

2    Verduzco Decl. ¶ 8; Castillo Decl. ¶ 3; Keith Decl. ¶¶ 5-6; Lugo Decl. ¶ 14; Williams Depo p

3    44:2-24.

4    16.    Dialogue continued between Williams, Rote, Keith and Lugo.  However, Williams continued

5          to refuse all orders to comply, to cuff and to voluntarily exit his cell.  Castillo Decl. ¶ 3; Keith

6          Decl. ¶6; Lugo Decl.¶ 15; Williams Depo 45:2-19.

7    17.    Williams placed a sheet over the door and turned the lights out to keep the room dark.  Williams

8          Depo p. 42:17-19, 50:25-51:9, 71:5-8.

9    18.    At 11:11 a.m., the cell extraction team approached the cell.  Sergeant Rote and Defendant

10          Comstock used the X-10 Oleoresin Capsium (OC) extension device to administer OC inside

11          Williams' cell.  Comstock Decl. ¶ 4; Rote Decl. ¶ 6; Lugo Decl. ¶ 16; Williams Depo p. 18:4-7,

12          46:6-15, 47:6-48:15.

13    19.    Williams was again ordered to cuff up and voluntarily exit his cell.  Williams again refused to

14          comply with this order.  Lugo Decl. ¶ 17, Williams Depo p. 18:4-7.

15    20.    The team waited for approximately 10 minutes to allow the OC to have an effect and to give

16          Williams an opportunity to comply with orders to cuff up and exit the cell.  Comstock Decl. ¶

17          6; Rote Decl. ¶ 7; Lugo Decl. ¶ 18; Williams Depo p. 18:4-7.

18    21.    At 11:21 a.m., additional OC was again administered in Williams' cell from the X-10 and a MK-

19          46 projector.  Williams was again ordered to comply with orders to cuff and exit the cell but he

20          again refused.  Comstock Decl. ¶ 6-7; Rote Decl. ¶ 7; Lugo Decl. ¶ 19; Williams Depo p. 18:4-7,

21          51:9-14.

22    22.    Psychiatric Technician T. Keith and Lt. Lugo continued to talk with Williams and verbally

23          persuade him to comply.  These attempts were also unsuccessful.  Comstock Decl. ¶ 8; Keith

24          Decl. ¶ 6; Lugo Decl. ¶ 20; Williams Depo p. 69:4-70:17.

25    23.    At 11:36 a.m., the cell extraction team was assembled in front of Williams' cell.  Williams was

26          again ordered to cuff up and voluntarily exist his cell.  Williams again refused to comply.  It was

27          determined that Williams would not comply with further requests to voluntarily exit the cell and

28          Lt. Lugo ordered the team to extract him from his cell.  Verduzco Decl. ¶¶ 8-9; Lugo Decl. ¶ 21.

24. A mattress was placed in front of the door blocking the food port.  Verduzco Decl. ¶ 7; Rote Decl ¶ 8.

25. Williams had the opportunity to comply with the orders to cuff up both before and after the administration of chemical agent, yet he did not.  Williams Depo p. 49:4-20, 50:5-15, 51:21-25, 52:20-53:13, 53:17-54:16, 69:6-13.

26. At approximately 11:39 a.m., the cell door was opened and the cell extraction team entered the cell.  Lt. Lugo administered one burst of OC at Williams.  Lugo Decl. ¶ 22.

27. The floor was slippery and wet.  Members of the cell extraction team slipped to the ground. Heredia Decl. ¶ 4; Verduzco Decl. ¶ 9; Comstock Decl. ¶ 9; Bicknell Decl. ¶ 4; Rote Decl ¶ 9; Williams Depo p. 31:12-15, 55:20-25.

28. The cell extraction team physically forced Williams in a prone position and placed restraints on him.  The physical force consisted of officers grabbing Williams arms, legs and body and placing him on the ground.  Officers then secured restraints to Williams' arms and ankles.  Verduzco Decl. ¶¶ 9-11; Comstock Decl. ¶¶ 10-11; Castillo Decl. ¶ 5; Heredia Decl ¶¶ 5-7; Bicknell Decl. ¶¶ 5-8; Chavez Decl. ¶ 3; Rote Decl. ¶ 10; Williams Depo p. 56:6-25, 57:1-7, 58:4-25.

29. The use of physical force lasted approximately 15 seconds.  Williams Depo. P. 18:24-19:1, 60:21-24.

30. Williams was then placed on a gurney and taken outside to be decontaminated with water. Verduzco Decl. ¶¶ 9-11; Comstock Decl. ¶¶ 10-11; Castillo Decl. ¶ 6; Bicknell Decl. ¶9; Rote Decl. ¶ 10; Williams Depo p. 19:3-7, 64:2-6.

31. No staff observed other staff strike Williams.  Verduzco Decl. ¶12; Comstock Decl. ¶12; Castillo Decl. ¶7; Heredia Decl ¶9; Bicknell Decl. ¶10; Martinez Decl. ¶ 7; Lugo Decl. ¶ 25; Rote Decl. ¶ 12.

32. While outside and immediately after the extraction, Williams was medically evaluated by MTA Chavez.  Comstock Decl. ¶11; Chavez Decl. ¶ 4; Lugo Decl. ¶ 24; Williams Depo p. 19:3-7.

33. MTA Chavez observed and noted that Williams had injuries consisting of abrasions to his shoulders, hips, elbows and left thigh.  Plaintiff further sustained a cut to his knee and lower lip. Williams told MTA Chavez that his left side hurt and his eyes burned, but that he did not have

1    difficulty breathing.  Chavez Decl. ¶¶ 5, 7.

2    34.    Williams was placed underneath an outdoor shower and rinsed with copious amounts of water

3           to decontaminate him from the OC spray.  The MTA determined that no other treatment was

4           necessary at the time.  Chavez Decl ¶ 6.

5    35.    MTA Chavez further observed that Williams appeared to be in good spirits and was laughing and

6           joking.  Williams was medically cleared and returned to custody.  Chavez Decl. ¶ 8; Martinez

7           Decl. ¶ 7.

8    36.    On May 15, 2001, Williams was interviewed by Lt. Lugo regarding the May 13, 2001 cell

9           extraction, because Williams sustained a cut to his lower lip.  Lugo Decl. ¶ ¶ 26-29.

10   37.    The cell extraction and post extraction interview was video taped.  Martinez Decl.¶ ¶ 3-5, 8.

11          Declaration of K. Ross ¶¶ 2-10 and Exhibits 1-2.  Lugo Decl. ¶¶ 26-29.

12   38.    Williams claims to have been hit twice in the face and groin, however, Williams cannot identify

13          the officer or officers who allegedly struck him or otherwise used excessive force.  Lugo Decl.

14          ¶ 27; Williams Depo 19:20-22, 58:1-3, 66:4-67: 11, 73:17-22.

15   39.    Williams did not file a claim with the state of California Victims Compensation and Government

16          Claims Board regarding the incident.  Williams did not allege compliance with the California

17          Tort Claims Act.  Willaims Depo p. 14:9-17; See also, Complaint generally.

18   IV.    Discussion

19          A.    Excessive Force Claim

20                 "Whenever prison officials stand accused of using excessive physical force in violation

21   of the Cruel and Unusual Punishment Clause [of the Eighth Amendment], the core judicial inquiry is

22   . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

23   sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 7 (1992) (citing Whitley v. Albers, 475

24   U.S. 312, 320-21 (1986)).  "In determining whether the use of force was wanton and unnecessary, it may

25   also be proper to evaluate the need for application of force, the relationship between the need and the

26   amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts

27   made to temper the severity of a forceful response.'"  Hudson, 503 U.S. at 7.  The absence of serious

28   injury is . . . relevant to the Eighth Amendment inquiry, but does not end it."  Id.

1    Not "every malevolent touch by a prison guard gives rise to a federal cause of action.  Id. at 9.

2    "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,

3    violates a prisoner's constitutional rights."  Id. (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir.

4    1973) (cert. denied sub nom. Johnson, 414 U.S. 1033 (1973)).  "The Eighth Amendment's prohibition

5    of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses

6    of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of

7    mankind.'"  Id. at 9-10.

8         Defendants argue that plaintiff's claim that he was subjected to excessive force when he was

9    extracted from his cell does not rise to the level of a constitutional violation because given the situation,

10   there was a strong need to secure plaintiff and the cell.  Defendants point out that plaintiff had forced

11   his food port open, thrown an unknown liquid at staff, had additional cups of liquid within reach, refused

12   orders and requests to voluntarily exit his cell, did not give any indication of non-violent intent and

13   clearly appeared hostile to officers.  Defendants argue their response to the threat posed by plaintiff was

14   a reasonable use of force as a measure to control him, disarm him and prevent his from creating a more

15   dangerous situation.  Defendants contend their actions were reasonable because they were measured and

16   appropriate.  They point out that numerous unsuccessful attempts were made to gain plaintiff's voluntary

17   compliance.  It was only after these unsuccessful attempts that the defendants were ordered to enter the

18   cell and physically extract plaintiff.  Moreover, a supervisor determined that force was necessary to gain

19   plaintiff's compliance.

20        The court finds that defendants have met their initial burden of informing the court of the basis

21   for their motion, and identifying those portions of the record  which they believe demonstrate the

22   absence of a genuine issue of material fact.   The burden therefore shifts to plaintiff to establish that a

23   genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio

24   Corp., 475 U.S. 574, 586 (1986).

25        In his complaint, plaintiff alleges that during the cell extraction when defendants had him pinned

26   to the floor, defendants continued to utilize force by striking plaintiff with clenched fists numerous

27   times.  Comp. ¶ 13.  Plaintiff alleges that his head was then picked up and slammed against a stainless

28   steel toilet with such force that it caused him to lose consciousness.  Id.  Plaintiff also contends that on

9

1  three (3) separate occasions during the cell extraction, the video-camera was malfunctioning.  Comp.

2  ¶ 18.

3      Plaintiff submits no evidence demonstrating that defendants employed force maliciously or

4  sadistically for the very purpose of causing harm.  It is undisputed that on May 13, 2001, plaintiff put

5  his hand in the food port so that it could not be closed and further, that he tied sheets through the food

6  port and the bottom of the door in such a way as to keep the food port open.  Plaintiff took these actions

7  with the knowledge that he was creating a situation that would subject him to a cell extraction.  He also

8  knew that a cell extraction involved the use of force.  Plaintiff then refused to comply with orders to cuff

9  up and orders to voluntarily exit his cell.  It was only after plaintiff's refusal to comply with numerous

10  attempts by staff to gain his compliance that the OC device was used.  Even after the chemical agent was

11  used, plaintiff still refused to cuff up and voluntarily exit his cell.  Plaintiff was given approximately 10

12  minutes to comply with orders and still refused.  Staff continued to try to persuade plaintiff to comply

13  but all attempts were unsuccessful.  It was only then that Lt. Lugo ordered the team to physically extract

14  plaintiff from his cell, which involved the extraction team entering the cell and physically forcing

15  plaintiff to a prone position and placing restraints on his arms and ankles.

16      Insubordination is a matter taken very seriously within the confines of an institutional setting.

17  Plaintiff's refusal to comply with the direct orders of defendants created a need for the application of

18  force to gain plaintiff's compliance, and the force at issue was employed for the very purpose of gaining

19  plaintiff's compliance with the order.  When an inmate refuses to comply with the order of a staff

20  member, a threat may be reasonably perceived by staff.  It is undisputed that defendants repeatedly

21  ordered plaintiff to comply before plaintiff was physically extracted from his cell, and it is undisputed

22  that despite these orders, plaintiff continued to refuse to comply.  Thus, defendants could reasonably

23  have perceived plaintiff's continued disobedience to be a threat requiring the use of force.  Finally,

24  taking plaintiff to the ground and placing him in restraints was a use of force tailored to gain plaintiff's

25  compliance.  While plaintiff alleges that defendants struck him and slammed his head against a stainless

26  steel toilet, the video submitted by defendants depicts a reasonable use of force under the circumstances.

27  The video shows plaintiff's repeated refusal to comply with orders to cuff up and his resistance and

28  struggle even after the officers entered his cell.  The video tape clearly shows that staff only resorted to

1 the use of force when plaintiff made it necessary.  Plaintiff does not specifically dispute the videotape

2 as an accurate depiction of the cell extraction.  While defendants do not recall specifically striking

3 plaintiff, given the resistance and struggle in the cell, the force shown in the videotape was not

4 unreasonable.  The undisputed evidence does not depict force that was wanton or unnecessary.

5      The force applied by defendants was reasonable under the circumstances.  Viewing the evidence

6 in the light most favorable to plaintiff, the allegations that after plaintiff intentionally caused a

7 disturbance by refusing to allow his food port to close and refused to comply with orders to voluntarily

8 exit his cell, defendants forcefully entered his cell and forcefully took him to the ground simply do not

9 support a claim for relief under section 1983 for use of excessive physical force.  Given the record as

10 a whole, a rational trier of fact could not find for the plaintiff.

11      Because the court recommends that defendants' motion for summary adjudication on plaintiff's

12 excessive force claim, the court does not reach defendants' argument that they are entitled to qualified

13 immunity on this claim.

14      B.      State Law Claims

15      Turning to plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a), in any civil action in

16 which the district court has original jurisdiction, the district court "shall have supplemental jurisdiction

17 over all other claims in the action within such original jurisdiction that they form part of the same case

18 or controversy under Article III," except as provided in subsections (b) and (c).  "[O]nce judicial power

19 exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is

20 discretionary."  Acri v. Varian Assoc., Inc., 114 F.3d 999, 1000 (9th Cir. 1997). "The district court may

21 decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court

22 has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  The Supreme

23 Court has cautioned that "if the federal claims are dismissed before trial, . . . the state claims should be

24 dismissed as well."  United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).

25      Here, the court has found that defendants are entitled to summary adjudication on plaintiff's

26 federal claims against them.  As a result, the only claims left are state law claims for assault and battery

27 and intentional infliction of emotional distress.  The court therefore recommends that the court decline

28 to exercise supplemental jurisdiction over plaintiff's state law claims, and that the claims be dismissed

1    from this action, without prejudice.

2        V.      Conclusion

3        Based on the foregoing, it is HEREBY RECOMMENDED that defendants' motion for summary

4    judgment, filed September 30, 2005, be granted.

5        These Findings and Recommendations will be submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days**

7    after being served with these Findings and Recommendations, the parties may file written objections

8    with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and

9    Recommendations."  The parties are advised that failure to file objections within the specified time may

10   waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11

12       IT IS SO ORDERED.

13       **Dated:    July 19, 2006**              **/s/ Dennis L. Beck**
     3b142a                                   UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12